ORMAN S. JEFFERY, APPELLANT, V. SILAS H. BURNHAM,
JR., ET AL., APPELLEES.

FILED FEBRUARY 27, 1923.   No. 22149.

**Trover.** Plaintiff agreed to exchange liberty bonds for first mortgages
upon irrigated land in Wyoming. The liberty bonds were delivered
when the contract was made, and it was agreed that the mortgages
should be sent to him by mail. When the papers arrived they
proved to be assignments of deferred payment contracts for the
sale of land and water rights under the Carey Act. Plaintiff
promptly tendered back the notes, assignments, and contracts,
and demanded the return of the liberty bonds, which was refused,
and the bonds sold. *Held,* that under the evidence the retention
and sale of the bonds constituted a conversion, and the plaintiff
was entitled to recover.

APPEAL from the district court for Lancaster county:
FREDERICK E. SHEPHERD, JUDGE. *Reversed.*

*W. L. Kirkpatrick, Good & Good* and *P. C. Spencer.*
for appellant.

*Stout, Rose, Wells & Martin* and *Bruce Fullerton,*
contra.

Heard before MORRISSEY, C. J., LETTON, DEAN, DAY
and ALDRICH, JJ., REDICK, District Judge.

LETTON, J.

This is an action for conversion, brought to recover
the market value of certain liberty bonds delivered by
the plaintiff to defendants in exchange for certain
first mortgages upon irrigated land in Wyoming, which
were to be sent him by mail.

Plaintiff alleges that defendants tendered some notes
and contracts of sale, but that the securities tendered
were not first mortgages, as agreed; that he promptly
offered to return to defendants all securities and papers
delivered by them and demanded the return of his
Liberty bonds, which was refused, and the bonds were
converted by defendants to their own use.

The defendants admit the receipt of the bonds, and

allege that a contract of exchange was made with plaintiff, and that he was informed of the nature of the securities and was familiar with the same, and that he made the contract of exchange with full knowledge. They deny all allegations of fraud. They also file a counterclaim for $113.77 and interest, as the amount due them on the exchange over and above the face value of the bonds.

The case was tried to the court without a jury, resulting in a judgment for defendants on the plaintiff's claim, and for the plaintiff on the counterclaim. Plaintiff appeals.

James R. Deane, a member of the firm of Burnham & Deane, who had formerly sold some stock in a brick company to the plaintiff, Jeffery, called upon the latter at his home near Benedict, Nebraska, about September 22, 1920, and left with Mr. and Mrs. Jeffery a circular to examine, telling them that they could make 8 per cent. on their money by investment in the securities he was offering, instead of 4¼ per cent. which they were receiving upon the liberty bonds which they held. The circular is entitled:

"Burnham & Deane,
Investment Bankers.
"Dealers in Conservative Bonds,
Mortgages and Investments."

On the next page of the circular:

"Mortgage Notes Yielding 8%

"We offer, subject to prior sale, $175,000 worth of first lien and *first mortgage* on Carey Act lands belonging to the Lake View Canal Co. These securities are the unpaid balance amounting to $37.50 per acre on a perpetual water right granted to the Lake View Canal Company by the state of Wyoming, and are further secured by the land which is irrigated by this water."

The circular states, among other things: "We believe in offering a security that the paramount consideration

is, 'What will the lands on which a *mortgage* is held
be worth at maturity?' We further believe, and we
always bear this in mind, that unless the land which
secures a *mortgage note* is bound, beyond a question
of a doubt, to increase in value, that the holder of a
*mortgage note* is in a somewhat precarious condition."
Also: "Remember, when we present this attractive in-
vestment to you, you are not buying a *mortgage which is
based on a speculative value.* The value of the water and
land which has been purchased in this particular instance
has been fixed by the state of Wyoming, therefore, you
are absolutely assured that the moment this land is put
under cultivation, and a great deal of it has already
been put under cultivation, that this land security will
increase as time goes on, and you would never have to
foreclose for the payment, as the surrounding farmers
would not allow this land to be sold for the *mortgage."*
The italics are ours and are inserted merely to make
evident the frequent use of the term "mortgage" as
describing the articles to be sold.

There are a number of other statements in the cir-
cular, which, if all reference to "mortgages" and "first
mortgages" were eliminated, might give a fair and correct
idea of the nature of the securities, but, when considered
in connection with the statements and implications that
the securities offered are "mortgage notes" and "first
lien and first mortgage on Carey Act lands," they, and
the oral statements by Deane, were well calculated to
deceive any person not familiar with the somewhat
intricate provisions of the United States statutes and the
statutes of Wyoming regarding such reclamation projects,
and with the nature of assignments of contracts of
purchase of water rights under such statutes.

Deane returned to the Jeffery farm on September
29, and, after considerable conversation relating to
"mortgages," he left and returned again on the 30th,
when he, with Mr. and Mrs. Jeffery, went to the bank

at Benedict.   Mr. Ward, the banker, testified as follows:
"I said, 'What are you doing Mr. Jeffery? Are you selling
these bonds to this man?' or something, and Mr. Deane
spoke up and said, 'He is trading me $5,000 worth of
liberty bonds for a first real estate mortgage on Wyoming
irrigated land drawing 8 per cent. interest;' and he went
on to explain how much better it was to be drawing
8 per cent. on a first real estate mortgage than carrying
the bonds at 4¼ per cent. and I agreed with him." Mr.
Jeffery had delivered the bonds to Deane at the bank.
Ward testifies, "I asked Mr. Deane if he had the
mortgage with him, and he said, 'No, I haven't, it will
be mailed from Lincoln.' " A receipt in the following
form was then given by Deane:

"Benedict, Neb. Sept. 30th, 1920.

"$5,000.

"Received of Orman S. Jeffery five thousand and
00/100 dollars. Account mortgage in amount of $5,000
to be mailed from Lincoln office.

"Burnham & Deane by J. R. Deane."

A letter is in the record from Burnham & Deane to
Jeffery under date of October 2, acknowledging receipt
of the $5,000 in liberty bonds, "received from you
on your purchase of five-year notes from us," and
inclosing an assignment of water contract and a five-
year note of Frank J. Hubka for $3,700.05, indorsed
without recourse. The letter also suggests that the
firm had selected, in addition to this note, three notes
to Oscar Johnson, making a total of $5,422.50, leaving
a balance due of $506.70, and concluding, "If this
arrangement is not satisfactory, kindly let us know at
once." On receipt of this letter with the Hubka con-
tract and note, Jeffery went to Benedict to consult
his banker, and he and Mr. Ward went to York to
see a lawyer, Mr. Kirkpatrick. The next day, October
6, the Jefferys went to Lincoln to see Mr. Deane in
order to procure the return of the bonds. They then
tendered back to Deane all the papers which had been

sent and asked for their bonds. Deane looked them over, and handed them back, saying, that Mr. Burnham had the bonds, and he would have to find out if he had disposed of them; that as soon as he saw Mr. Burnham he would write and let them know. Jeffery was unable to wait and went home. The next day they received a letter, dated October 9, stating the bonds had been disposed of "last Saturday," and inclosing two notes given by one Robertson. The letter does not mention "mortgages" but speaks of the papers as "securities." It also states that there is a balance due of $62.63, for which a remittance is asked. This action was brought within 30 days.

Defendants say that Jeffery was familiar with such deferred payment contracts and with their sale and assignment as securities, and contracted with full knowledge at arm's length. This is based on his testimony, as follows: "Q. What, if anything, did he say about the Carey Land Act? A. Well, he said that this land was under the Carey Act, land act; and he says that the Wheatland project was under the Carey Land Act, and I told him that it was, and he said there was nothing that was any better. I told him that I guessed that they were all right as far as anything that I knew, that different ones had told me that that was the best there was, and that was as much as I knew about it. Q. That is the land deal we are talking about? A. The Carey Act water right—you see the Carey Act—that is under the Carey Act water right. Q. You discussed the quality of the Carey Act water right? A. Well, that was about all that was said. He said, 'Well, then, you know what the Carey Act is?' I said, 'That is about all I know about it' "—and upon the further fact that Jeffery, some 20 years before, had bought land with a water right under the Carey Act in Wyoming from a real estate agent, and had finally procured his deed or patent from the state of Wyoming.

These facts do not establish that he was informed of

the nature and character of these securities. This is only an inference of defendants and . is unwarranted. There. is no evidence that Jeffery ever had anything to do with the purchase or sale of water-right contracts under the Carey Act as securities, or that he contracted for and expected to receive anything but first mortgages upon the land itself. When a man contracts and agrees to exchange first mortgages for liberty bonds, he ought to be required, if he tenders securities other than first mortgages, to show that he fully disclosed the real and true character of such securities before the contract was made so that the minds of the parties met with full knowledge. Deane may have believed all that he said, and all that was in the circular, but this would not deprive Jeffery of the right of rejection if the securities tendered were not such as were represented. Assuming that the notes and assignments of contract are worth as much as mortgages would be worth, this does not affect Jeffery, because he had the right to stand on his contract and insist that his bonds be returned when defendants failed to deliver the mortgages. Such securities are not first mortgages, and to describe them as such in .the circular and by oral statement was a misrepresentation as to their character. When the liberty bonds were procured from Jeffery. they were disposed of almost immediately, and, although plaintiff acted with the utmost promptitude as soon as he found that the mortgages he bought were not delivered, the defendants retained and still retain the fruits of the transaction.

On the undisputed facts, Jeffery did not receive that for which he agreed to exchange his bonds. The sale of the bonds by defendants until after Jeffery was willing to accept the notes and assignments sent him was unauthorized, and constituted a conversion of his property. This is not a case of rescission on the ground of fraud. There never was a contract to exchange liberty bonds for the papers sent Jeffery. The contract

with him was never executed by defendants, and the bonds never rightfully became . their property.

The case was tried to the court without a jury, but the principle that the findings of a court upon the facts in a law action upon conflicting evidence, like a verdict, will not be set aside unless manifestly wrong does not apply in this case, because the evidence in regard to the material points, ' when the cross-examination of Mr. Deane is considered, is not in substantial conflict. The allegations of the petition with respect to keeping. the tender good are not faultless, but, of course, before any judgment could be rendered in favor of plaintiff the papers sent him would be required to be in the hands of the court for delivery to defendants.

REVERSED AND REMANDED.